**42**

AUSA  REGINA R. MCCULLOUGH
Special Agent  JOSEPH ROBERTSON, TFO, DEA

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America
v.

DR. BASIL AZIM-ABDULMUTI QANDIL

Case:2:13-mj-30029
Judge: Unassigned,
Filed: 01-15-2013 At 05:42 PM
SEALED MATTER (JMC)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 2011 to present _____ in the county of _____ Wayne _____ in the
_____ Eastern _____ District of _____ Michigan _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| **Title 18, United States Code, §§ 1347 and 1349** | **CONSPIRACY TO COMMIT HEALTH CARE FRAUD.** |
| **Title 21, United States Code, §§ 841(a) (1) and 846** | **CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES.** |

This criminal complaint is based on these facts:

SEE AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

JOSEHPH ROBERTSON, TFO, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 15, 2013 _____

City and state: _Detroit, Michigan_ _____

_____
*Judge's signature*

HON. R. STEVEN WHALEN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1. The undersigned, Joseph Robertson, hereinafter referred to as the Affiant, being first duly sworn, hereby deposes and states as follows:

2. I submit this affidavit in support of a two count complaint charging Basil Azmi-Abdulmuti QANDIL M.D. with Conspiracy to Unlawfully Distribute a Controlled Substance (more specifically, Oxycodone, Hydrocodone, Alprazolam, and Promethazine with Codeine) in violation of Title 21, United States Code, Section 846 and Conspiracy to Commit Health Care Fraud in violation of Title 18 United States Code, Section 1349.

3. Affiant is a Police Officer with the Livonia Police Department and has been so employed for the past 17 years. Officer Joseph Robertson is assigned to the Drug Enforcement Administration as a Task Force Officer (TFO) and has been in this capacity since June 1, 2012. That he has been to an 80-hour DEA basic narcotics school, a Michigan State Police 40-hour undercover narcotics school, a Michigan State Police raid entry school, and has conducted numerous drug investigations, arrests, and search and seizures related to drug violations. He is tasked to investigate violations of Title 21 United States Code, Section 841(a)(1), Distribution of Controlled Substances. He is a law enforcement officer empowered to conduct investigations and make arrests for violations of Title 21, United States Code and other federal felony offenses. The information contained in this affidavit includes his personal observations and information he has obtained from discussions with other law enforcement officers.

## BACKGROUND

## The Medicare Program

4.  The Medicare Program (Medicare) is the federal health insurance program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395. Medicare is administered through the Centers for Medicare and Medicaid Services (CMS). CMS is a division of the United States Department of Health and Human Services.

5.  Medicare includes coverage under two primary components, hospital insurance (Part A) and medical insurance (Part B). Part A covers physical therapy, occupational therapy, and skilled nursing services if a facility was certified by CMS as meeting certain requirements. Part B of the Medicare Program covers the cost of physicians' services and other ancillary services not covered by Part A.

6.  National Government Services is the CMS intermediary for Medicare Part A in the State of Michigan. Wisconsin Physicians Service is the CMS contracted carrier for Medicare Part B, which includes home visits, in the State of Michigan. Cahaba Safeguard Administrators, LLC (Cahaba) is the Program Safeguard Contractor for Medicare Part A and Part B in the State of Michigan.

7.  The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury." What is "reasonable and necessary" for certain conditions is defined based upon accepted practices in the medical community, as further defined by National Coverage Determinations issued by CMS and Local Coverage Determinations issued by the Medicare administrative contractor for the State of Michigan.

8. The Michigan Department of Labor and Economic Growth (DLEG) records show that

QANDIL Family Medical & Urgent Care Center, PLLC  is a Professional Domestic Limited

Liability Company registered to do business in the State of Michigan.  Qandil Family Medical

was incorporated on or about . ?.  Dr. Basil  A. Qandil  signed the Articles of Organization as

Organizer.  Dr. Qandil is an enrolled Medicare provider with Medicare provider number

MI2077.

9. 21 U.S.C.§ 830 (b) (3)(A) (ii) defines a valid prescription as a prescription which is

issued for a legitimate medical purpose, by an individual practitioner licensed by law

to administer and prescribe the subject drugs, who is acting in the usual course of the

practitioner's professional practice in issuing the prescription.  21 U.S.C. §842 (a) (1)

states that it is unlawful for any person who is subject to the requirements of licensure

to distribute or dispense a controlled substance in violation of section 829 of this title.

10. 21 C.F.R. (Code of Federal Regulations), § 1306.04 (a) states that "a prescription for

a controlled substance to be effective must be issued for a legitimate medical purpose

by an individual practitioner acting in the usual course of his professional practice.

11. Dr. Basil Qandil was initially registered with DEA on May 18, 2009 and assigned

DEA Registration number FQ1390626. The DEA Registration is valid through April

30, 2015. QANDIL FAMILY MEDICAL is a controlled premise within the meaning

of 21 U.S.C. and Section 1316.02(c) of Title 21 C.F.R.  Pursuant to his registration,

Dr. QANDIL is entitled to issue prescriptions for controlled substances under

Schedules II, IIN, III, IIIN, IV, and V provided they are for a legitimate medical

purpose and that he is acting in the usual course of his professional practice.

Furthermore, Dr. QANDIL is required to keep complete and accurate records of all

controlled substances received, sold, delivered, or otherwise disposed of pursuant to 21 U.S.C. 827 and 21 C.F.R. 1304.01 et seq. on the controlled premises. Dr. QANDIL is listed as the resident agent of QANDIL FAMILY MEDICAL since August 4, 2009.

12. Common "red flag" indicators that a practitioner is prescribing controlled substances outside the course of legitimate medical purpose include, but are not limited to, a practitioner prescribing a significant amount of particular controlled substances to a substantial percentage of his or her patients, a practice also described as "cookie cutter prescribing," the prescription of "combinations" of controlled substances known to be abused, primarily accepting cash payment for office visits and charging higher than "usual and customary" fees for office visits, and a practitioner's prescriptions primarily being filled at only a few pharmacies.

13. Common "red flag" indicators that "patients" are seeking controlled substance prescriptions outside the course of legitimate medical practice include, but are not limited to, members of the same household obtaining the same controlled substances, patients paying "higher then customary" office charges and paying cash for office visits when they have health insurance, and patients obtaining excessive quantities of controlled substances over an extended period of time, generally longer than a six month period.

14. The Drug Enforcement Administration has determined that certain prescription medications are controlled based on their potential for addiction and abuse. The U.S. Drug Enforcement Administration assigns Schedules to these prescription medications according to their potential for abuse and addiction, with a controlled substance in

Schedule II having the highest potential for addiction and abuse. Prescription drugs which are controlled are assigned to Schedule II, III, IV or V.

    a. Oxycodone, generic name for Roxicodone, Oxymorphone, generic name for Opana are Schedule II narcotics, as defined in 21. U.S.C. Section 812 and 21 C.F.R 1308.12 (b)(1)

    b. Hydrocodone, generic name for Vicodin is a schedule III narcotic as defined in 21 U.S.C. section 812 and 21 C.F.R. 1308.13 (e)(1)

    c. Alprazolam, generic name for Xanax is a Schedule IV controlled substance, as defined in 21 U.S.C. Section 812 and 21 C.F.R. 1308.14(c).

    d. Promethazine with Codeine is a Schedule V controlled substance, as defined in 21 U.S.C. 812 and 21 C.F.R. 1308.

15. A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances. The Sixth Circuit, along with other courts, has held that it is unlawful for a practitioner to distribute a Schedule II-V controlled substance if the doctor or pharmacist is not acting within the usual course of professional practice in violation of 21 U.S.C. § 841, United States v. Johnson, 71 F.3d 539, 542 (6th Cir. 1995), cert. denied, 517 U.S. 1113 (1996).

## DETAILS OF INVESTIGATION

16. This investigation was opened as a result of complaints filed with the Hamtramck Police Department regarding disturbances at QANDIL FAMILY MEDICAL (9222 Joseph Campau, Hamtramck, MI) and a complaint regarding the suspicious nature that Dr. Basil QANDIL dealt with a specific patient on 6/12/2012.

17. On 6/4/2012, Officers Hendrick #16 and Kruse #60 of the Hamtramck Police Department were dispatched to the QANDIL Family Medical located at 9222 Joseph Campau in Hamtramck, MI on a disturbance complaint. Upon Officer Hendrick and Kruse's arrival, they observed approximately 100 people waiting in front of the business, across the street, and waiting in cars parked in nearby parking lots. Officers Hendrick and Kruse entered QANDIL Family Medical and observed approximately 20 people in the waiting room/lobby taking up all of the available space inside. Officers Hendrick and Kruse also observed people seated in storage areas, back rooms, and the rear patio area. Officers Hendrick and Kruse continued their investigation and spoke to Dr. Basil QANDIL regarding the disturbance. Dr. QANDIL explained to Officers Hendrick and Kruse that he operates a walk in clinic and the large crowd had formed because he was out of the country in Jordan for two weeks. Dr. QANDIL further explained that he believed the crowd got out of hand over a disagreement over who was first in line to see him. Dr. QANDIL stated he normally sees 40 to 50 people in thirty minutes time at his office. When asked how he could possibly treat that many people in thirty minutes, Dr. QANDIL had no explanation.

18. On 6/12/2012, Officers from the Hamtramck Police Department were flagged down by a female with the initials (SB) in front of QANDIL Family Medical located at 9222 Joseph Campau in Hamtramck, MI. SB spoke to Officer Hendrick regarding her complaint and provided the following information:

SB said she went in to see her doctor (Dr. QANDIL ) and he refused to see her because she did not have $800 cash to pay. According to SB, Dr. QANDIL told her

he only accepts cash patients before 3:00 pm and she would have to come back after 3:00 pm, if she wanted to use her insurance and Medicaid. SB also provided information that Dr. QANDIL repeatedly attempts to sell her prescriptions including Oxycodone and Opana that she does not need or want and she refused both, saying she was not in pain.

## MAPS DATA

19. On January 1, 2003, the State of Michigan instituted the Michigan Automated Prescription System (MAPS). MAPS require that all pharmacies in the State of Michigan report on a monthly basis all controlled substance prescriptions filled at each pharmacy. These reports must be submitted to MAPS by the 15th day of the following month in which the prescription was filled. Controlled substance information reported to MAPS includes but is not limited to the following:

    Patient data: Name, address, date of birth;

    Physician data: Prescribers name and DEA number;

    Drug: Name of controlled substance, strength, quantity, prescription number;

    Pharmacy data: Dispensing pharmacy, dispensing date and DEA number.

20. Your affiant obtained a Michigan Automated Prescription System (MAPS) report from the Michigan Department of Community Health, Bureau of Health Services which identifies all controlled substance prescriptions written by Dr. Basil QANDIL and included all controlled substance prescriptions reported as being issued under Dr. QANDIL's DEA Number (FQ1390626) from 8/22/11 to 8/22/12. This analysis may not represent the actual total of controlled substance prescriptions filled by the patients during this time period due to potential non-reporting by pharmacies, the

time lag between the date the prescriptions are filled and the date they are reported to the state and appear in MAPS data, as well as other factors.

21. Based on the MAPS data, QANDIL prescribed a total of 2,467,526 dosage units of controlled narcotics between 8/22/11 and 8/22/12. The MAPS data also showed Dr. QANDIL prescribed 84,375 dosage units of Schedule II narcotics, 869,632 dosage units of Schedule III narcotics, 411,317 dosage units of Schedule IV narcotics, and 942,603 dosage units of Schedule V narcotics.

22. According to the MAPS data, QANDIL's most frequently prescribed controlled medications were as follows:

> **PROMETHAZINE WITH CODEINE - (4,050 prescriptions) 852,352 mls**
>
> **HYDROCODONE - 830,383 dosage units**
>
> **ALPRAZOLAM - 361,418 dosage units**
>
> **CARISOPRODOL - 119,239 dosage units**
>
> **OXYCODONE HCL - 76,076 dosage units**

23. A review of the MAPS data revealed several "red flags" which are usually synonymous with physicians involved in the illegal distribution of controlled substances. The review of the MAPS data revealed that QANDIL prescribed a disproportionate amount of dosage units of Hydrocodone (Vicodin), Oxycodone, Promethazine with Codeine, and Alprazolam (Xanax). According to the MAPS data, Dr. QANDIL prescribed approximately 28,979 individual prescriptions and approximately 2,120,669 combined dosage units of Promethazine with Codeine, Hydrocodone, Alprazolam, and Oxycodone between 8/22/11 and 8/22/12. According to the MAPS data, all other medications issued by Dr. QANDIL totaled

approximately 5,409 prescriptions and approximately 346,797 dosage units between 8/22/11 and 8/22/12. Based on this data, a significant amount of particular controlled substances (Hydrocodone, Promethazine with codeine, Alprazolam, and Oxycodone) is being prescribed to a substantial percentage of Dr. QANDIL's patients. Through training and experience, affiant knows that Oxycodone, Hydrocodone, Alprazolam, and Promethazine with codeine are highly diverted controlled narcotics.

24. Through the MAPS analysis, data was gathered which also identified several longer distance patients which is a common "red flag" for prescribing without a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The following patients were identified and pulled from the MAPS data:

   a. **Patient with the initials (TB):** Obtained a total of 655 dosage units of controlled narcotics from Dr. QANDIL between 11/1/11 and 8/15/12. According to the MAPS data, TB was given 360 dosage units of Oxycodone (Schedule II controlled narcotic) between 11/1/11 and 08/15/12. NOTE: TB was prescribed 120 dosage units of Oxycodone 325 mg on 12/23/11 and another 60 dosage units of Oxycodone 30mg on 12/27/11 by Dr. QANDIL. TB also received 55 dosage units of Hydrocodone (Schedule III narcotic) and 240 dosage units of Alprazolam (Schedule IV controlled narcotic) from Dr. QANDIL between 11-1-11 and 08-15-12. The MAPS data also showed TB received prescriptions from ten separate doctors between 8/31/11 and 8/21/12. The MAPS data relating to TB is consistent with "doctor shopping" as she obtained 7,265 dosage units of controlled prescriptions from multiple doctors (10) over a one-year period. TB travelled

approximately 75 miles (one way) for the services of Dr. QANDIL over a 9 1/2
month period.

b. **Patient with the initials (KS)**: Obtained a total of 1,595 dosage units of
controlled narcotics from Dr. QANDIL between 8/29/11 and 8/2/12. According to
the MAPS data, KS obtained 905 dosage units of Hydrocodone, 300 ml of
Promethazine with Codeine syrup (Schedule V controlled narcotic), and 390
dosage units of Alprazolam between 9/3/11 and 8/2/12. KS travelled
approximately 27 miles (one way) over a period of a year for the services of Dr.
QANDIL.

c. **Patient with the initials (JW)**: Obtained a total of 765 dosage units of controlled
prescriptions from Dr. QANDIL between 12/26/11 and 5/4/12. Between 12/26/11
and 5/4/12, Dr. QANDIL prescribed 360 dosage units of Oxycodone, 150 dosage
units of Alprazolam, and 240 ml of Promethazine with Codeine syrup to JW.
Based on the MAPS data, JW obtained a total of 1,055 dosage units of controlled
narcotics from two separate doctors over approximately a six-month period. JW
travelled approximately 65 miles (one way) from Toledo, Ohio for the services of
Dr. QANDIL between 12/26/11 and 5/4/12.

d. **Patient with the initials (TR)**: Obtained a total of 1,560 dosage units of
controlled narcotics from QANDIL between 8/22/11 and 8/2/12. Based on the
MAPS data, TR was given 300 dosage units of Oxycodone, 540 dosage units of
Hydrocodone, and 720 units of Alprazolam by Dr. QANDIL between 8/22/11 and
8/2/12. The MAPS data also showed that TR obtained a total of 9,626 dosage
units of controlled narcotics from ten separate doctors between 7/11/11 and

8/2/12. The MAPS data relating to TR is consistent with "doctor shopping" as he obtained a total of 9,626 dosage units of controlled narcotics from multiple doctors (10) over a period of approximately one year. TR travelled approximately 22 miles (one way) for the services of Dr. QANDIL.

e. **Patient with the initials (CM)**: Obtained a total of 450 dosage units of controlled substances from Dr. QANDIL between 2/28/12 and 4/30/12. The MAPS data showed that 360 dosage units of Oxycodone and 90 dosage units of Alprazolam was prescribed to CM over a two month period. Based on the MAPS data, CM travelled approximately 65 miles (one way) from Toledo, Ohio for the services of Dr. QANDIL.

f. **Patient with the initials (VD)**: Obtained a total of 870 dosage units of controlled narcotics from Dr. QANDIL between 9/2/11 and 5/9/12. Based on the MAPS data, VD obtained 285 dosage units of Oxycodone, 120 dosage units of Alprazolam, and 60 dosage units of Hydrocodone from Dr. QANDIL between 9/2/11 and 5/9/12. The MAPS data also showed VD obtained a total of 1,380 dosage units of controlled narcotics from four separate doctors over approximately an eleven-month period. Based on the MAPS data, VD travelled approximately 72 miles (one way) for the services of Dr. QANDIL.

g. **Patient with the initials (YG)**: Obtained a total of 833 dosage units of controlled narcotics from Dr. QANDIL between 12/23/11 and 6/29/12. Based on the MAPS data, YG obtained 420 dosage units of Oxycodone, 360 dosage units of Alprazolam, and 53 dosage units of Fentanyl from Dr. QANDIL between 12/23/11 and 6/29/12. The MAPS data also showed YG obtained a total of 1,673

dosage units of controlled narcotics from two separate doctors between 9/7/11 and 7/30/12. YG travelled approximately 65 miles (one way) from Toledo, Ohio for the services of Dr. QANDIL.

h. **Patient with the initials (WS)**: Obtained a total of 465 dosage units of controlled narcotics from QANDIL between 2/9/12 and 7/25/12. The MAPS data showed WS obtained 285 dosage units of Oxycodone, 120 dosage units of Alprazolam, and 60 dosage units of Hydrocodone from Dr. QANDIL between 2/9/12 and 7/25/12. The MAPS data also showed WS obtained a total of 1,685 dosage units of controlled narcotics from six separate doctors over an approximately eleven-month period. The MAPS data relating to WS is consistent with "doctor shopping" as she obtained 1,685 dosage units of controlled medications from multiple doctors (6) over the approximately eleven-month period. WS travelled approximately 37 miles (one way) for the services of Dr. QANDIL.

i. **Patient with the initials (CS)**: Obtained a total of 1,035 dosage units of controlled narcotics from Dr. QANDIL between 11/15/11 and 7/14/12. According to the MAPS data, CS obtained 345 dosage units of Hydrocodone, 240 ml of Promethazine with Codeine syrup, and 150 dosage units of Alprazolam from Dr. QANDIL between 11/15/11 and 7/14/12. The MAPS data also showed that CS obtained a total of 1,635 dosage units of controlled narcotics from three separate doctors between 8/22/11 and 7/14/12. According to MAPS, CS travelled approximately 64 miles (one way) for the services of Dr. QANDIL.

j. **Patient with the initials (RH)**: Obtained a total of 1,050 dosage units of controlled narcotics from Dr. QANDIL between 9/6/11 and 7/23/12. According to

MAPS, RH obtained 720 dosage units of Hydrocodone and 330 dosage units from Dr. QANDIL between 9/6/11 and 7/23/12. According to MAPS, RH obtained a total of 1,275 dosage units of controlled narcotics from six separate doctors between 9/6/11 and 8/20/12. The MAPS data relating to RH is consistent with "doctor shopping" as she obtained a total of 1,275 dosage units of controlled medications from several doctors (6) over an approximately twelve-month period. According to MAPS, RH travelled approximately 72 miles (one way) for the services of Dr. QANDIL.

25. Updated MAPS data was obtained for controlled substance prescriptions issued by Dr. Basil QANDIL between August 23, 2012 and December 10, 2012. The MAPS data was obtained by TFO Robertson from the Michigan Department of Community Health, Bureau of Health Services and included all controlled substance prescriptions reported as being issued under Dr. QANDIL's DEA Number from August 23, 2012 through December 10, 2012.

26. Based on the MAPS data, Dr. QANDIL prescribed a total of 675,041 dosage units controlled narcotics in less than four months between August 23, 2012 and December 10, 2012. According to the MAPS data, Dr. QANDIL prescribed 39,433 dosage units of Schedule II narcotics, 380,197 dosage units of Schedule III narcotics, 198,106 dosage units of Schedule IV narcotics, and 55,280 dosage units of Schedule V narcotics between August 23, 2012 and December 10, 2012.

27. According to the MAPS data, Dr. QANDIL's most prescribed controlled medications were as follows:

    a. **Hydrocodone: 368,990 dosage units**

    **b.  Alprazolam: 174,663 dosage units**

    **c.  Oxycodone: 33,583 dosage units**

    **d.  Cheratussin AC: 26,435 dosage ml's**

    **e.  Codeine/Promethazine: (61 prescriptions) 14,130 ml's**

28. Through the MAPS analysis, TFO Robertson was able to identify twenty three patients who travelled from Ohio and obtained approximately 24,600 dosage units of schedule II through V controlled narcotics, twenty three patients from Flint who obtained approximately 6,880 dosage units of schedule II through V controlled narcotics , and three patients from Jackson who obtained approximately 690 dose units of schedule II through V controlled narcotics, to seek the services of Dr. QANDIL between August 23, 2012 and December 10, 2012. The patients from Toledo, OH travelled approximately 65 miles (one way), the patients from Flint travelled approximately 64 miles (one way), and the patients from Jackson travelled approximately 79 miles (one way), for the services of Dr. QANDIL.

29. The MAPS analysis may not represent the actual total of controlled substance prescriptions filled by the patients during this time period due to potential non-reporting by pharmacies, the time lag between the date the prescriptions are filled and the date they are reported to the state and appear in MAPS data, as well as other factors.

**TRASH PULLS**

**Trash pulls from 9222 Joseph Campau**

**September 13, 2012**

30. TFOs Joe Robertson, Sarah Buciak, Tom Wixson, and Jason Davis of the Detroit Field Division Group 15 TDS conducted a trash pull at QANDIL Family Medical located at 9222 Joseph Campau in Hamtramck, MI and obtained non-drug Exhibit N-1. TFO Robertson, as witnessed by TFOs Buciak, Wixson, and Davis, collected several garbage bags from the dumpster at the rear of 9222 Joseph Campau (QANDIL Family Medical and Urgent Care).

31. The collected trash was transported and later inspected by TFOs Robertson, Wixson, Buciak, and Davis. The collected trash contained the following items (Exhibit N-1): Exhibit N-1 is described as containing photocopies of several patient identification and health insurance cards in the following names:

   a. Patient with the initials (SH)

   b. Patient with the initials (KA) (Medicare insurance card # XXX-XX-XXXX-A)

   c. Patient with the initials (NZ) (Wayne County Health Choice #123013113)

   d. Patient with the initials (AA) and (MA) (MI Health card with unknown #)

   e. Patient with the initals (RL) (Medicare #XXX-XX-XXXX-A)

32. Exhibit N-1 is further described as containing Medical Lab reports, MAPS reports for various patients, patient forms, EKG report, torn written prescriptions with unreadable patient names, photocopies of patient IDs/insurance cards, billing receipt for $155.00 for a patient with the initials (CS), Basil QANDIL business card, Care Max pharmacy labels from prescriptions for Metronidazole 500 mg and Ciprofloxacin HCL 500 mg, miscellaneous residency paperwork and handwritten notes.

**October 30, 2012**

33. TFOs Joe Robertson, Tom Wixson, and Jason Davis of the Detroit Field Division Group 15 TDS conducted a trash pull at QANDIL Family Medical located at 9222 Joseph Campau in Hamtramck, MI and obtained non-drug Exhibit N-4. TFO Robertson, as witnessed by TFOs Wixson and Davis, collected several garbage bags from the dumpster at the rear of 9222 Joseph Campau (QANDIL Family Medical and Urgent Care).

34. The collected trash was transported and later inspected by TFO Robertson. The collected trash contained the following items (Exhibit N-4): Exhibit N-4 is described as containing several drug utilization review program forms for fifty one patients. The drug utilization review forms listed individual patient names along with a notification for areas of concern for each patient. The areas of concern included the following:

    a. Duplicate therapy

    b. Potential for abuse

    c. Inappropriate age for drug use

    d. Patient utilization of four or more pharmacies and prescribers for any combination of opioids may be associated with an increased risk of medication abuse/diversion

    e. Cumulative Acetaminophen daily dose exceeding 4 grams increases the risk of Hepatatoxicity

    f. Total amount of Opioids for the patient exceeds 360 days for the 90-day identification period of the review

35. Exhibit N-4 is further described as a Medco Pharmacy request for a 90 day supply of medication for a patient with the initials (LT) and (DP); residency papers for both

9222 Joseph Campau, Hamtramck, MI and 6466 Highview, Dearborn Heights, MI;
National Industrial Drug Rehabilitation/Primary care physician collaboration form
for a patient with the initials (JH); several patient medical forms; and prescription
photocopies for Xanax 2mg in the name of a patient with the initials (NF), Lortab in
the name of a patient with the initials (GH), Motrin 800 (Unreadable patient name),
and Vicodin E.S. in the name of a patient with the initials (DM).

**Trash pulls from 6466 Highview**

**October 8, 2012**

36. TFOs Joe Robertson and Sarah Buciak of the Detroit Field Division TDS Group 15
conducted a trash pull at the residence of Dr. Basil QANDIL located at 6466
Highview in Dearborn Heights, MI 48127, and obtained non-drug Exhibit N-2. TFO
Robertson, as witnessed by TFO Buciak, collected three garbage bags from the curb
in front of the residence at 6466 Highview.

37. The collected garbage bags were transported and later inspected by TFO Robertson
and TFO Buciak. The collected trash contained several billing statements listing
patient information and the return address of "QANDIL Family Medical and Urgent
Care 6466 Highview, Dearborn Heights, MI 48127" along with a torn Chase Bank
account statement (account# 000000XXXXXXXXX) for QANDIL Family Medical
and Urgent Care (non-drug Exhibit N-2).

38. At the time of the trash pull, Dr. Basil QANDIL's 2001 Oldsmobile Silhouette
minivan bearing Michigan license plate CAV2426 was parked unoccupied in the
driveway of 6466 Highview, Dearborn Heights, MI.

**October 29, 2012**

39. TFOs Joe Robertson, Sarah Buciak, and Tom Wixson of the Detroit Division Office TDS Group 15 conducted a trash pull at the residence of Dr. Basil QANDIL located at 6466 Highview in Dearborn Heights, MI 48127, and obtained non-drug Exhibit N-3. TFO Robertson, as witnessed by TFO Buciak, collected seven garbage bags from the curb in front of the residence at 6466 Highview.

40. The collected garbage bags were transported and later inspected by TFO Robertson, TFO Buciak, and TFO Wixson. The collected trash contained mail listing the following information: Basil A QANDIL – QANDIL Medical Urgent Care, 9222 Joseph Campau Suite A, Hamtramck, MI 48212 and residency paperwork listing Basil QANDIL, 6466 Highview, Dearborn Heights, MI 48127 (non-drug Exhibit N-3).

## CONFIDENTIAL SOURCE / UNDERCOVER DOCTOR VISIT

**November 7, 2012**

41. Agents/Officers from the Detroit Division Office Group 15 Tactical Diversion Squad (TDS) conducted surveillance of CS-1 (hereinafter referred to as CS) during a walk in office visit with Dr. Basil QANDIL located at 9222 Joseph Campau, Hamtramck, MI. An audio recording device was used (Exhibit N-5) during the CS doctor visit with Dr. QANDIL:

42. At approximately 08:30 am, TFO Joe Robertson and SA Thomas Farrell met with the CS at a neutral location and provided the CS with a transmitter device and $300 in Official Advanced Funds (OAF) to cover the expense of the office visit.

43. TFO Robertson performed a physical search of the CS's person and vehicle, as witnessed by SA Farrell, with negative results prior to the doctor visit.

   a. At approximately 08:53 am, TFOs Davis and Wixson observed a line forming outside of the office door to QANDIL Family Medical. At approximately 08:55 am, TFOs Davis and Wixson observed the front door to QANDIL Family Medical open and the line of people enter.

   b. At approximately 09:08 am, the CS arrived at QANDIL Family Medical and was observed walking inside of the lobby door by TFOs Davis and Wixson.

   c. From approximately 09:08 am to approximately 09:50 am, TFO Robertson and SA Farrell monitored the activities of the CS inside of the office by listening to the transmitter device.

   d. The CS spoke to an unknown female (UF) at the desk inside of the office. At approximately 09:45 am, the CS contacted TFO Robertson via cell phone text and said that he/she was told "No new patients without insurance."

   e. A few minutes later, TFO Robertson and SA Farrell could hear, via the transmitter device, the CS speaking to Dr. QANDIL. The recorded conversation was as follows:

   QANDIL: I just have a question. You are new and requesting medication.

   CS:       I just need something to help me...keep me off my feet.

   QANDIL: Which ones?

   CS:       Pain pills, whatever you can prescribe.

   QANDIL: You're OK with whatever I can give you?

CS:        But the thing is Vicodin and Motrin I can't take.

QANDIL: Which ones you take?

CS:        I need something stronger like Roxis or Oxys

QANDIL: I don't write you, have a nice day. I cannot help you on these. Sorry,
            Roxis or Oxys I cannot.

CS:        You can't?

QANDIL: No no, these two I cannot. I can give you the other ones you
            mentioned.

CS:        Vicodin I can't take, it gives me a headache.

QANDIL: I cannot help you, I am sorry. You will have to bring your documents
            too.

CS:        I don't even have the documents you need. I'll be your patient.

QANDIL: Yeah, I cannot help you with these two medicines. You need to bring
            all your records.

CS:        From where? I haven't seen a doctor in five years [laughs].

QANDIL: So why are you requesting something strong like that? It's really
            strong.

CS:        I'm on my feet.

QANDIL: Yeah, I can give you Vicodin, Lortab, Norco...that's what I can do.
            Other drugs, I cannot do without records.

CS:        What kind of records? I don't have any. What kind of record?

QANDIL: Record about the problems...you're...you know. If you don't have
            records, why are you requesting something strong like that?

CS:        [unintelligible]

QANDIL: Yes, yes exactly...but this medicine I cannot write without your records.

CS:        OK.

QANDIL: You don't understand me man. Let me say this one more time. The Roxicodone I cannot just write.

CS:        No, no.

QANDIL: "I need Roxi"...I cannot write that. If you know Roxi, how they control it, how they watch it, you wouldn't say I need Roxi. I cannot without records.

CS:        OK, if I'm your patient, I will have records with you right?

QANDIL: No, your previous records.

CS:        How long ago?

QANDIL: You don't get it...you grab your records from whoever you been seeing before me.

CS:        I haven't seen nobody in five years.

QANDIL: Then don't ask for Roxis then.

CS:        OK, look I understand. I lost my job four years ago. I have no insurance.

QANDIL: I cannot write you that shit. I cannot I cannot write you that medicine. You can leave now. [Dr. Qandil then walked the CS to the front lobby. TFO Davis and TFO Wixson observed the CS walk out of the front door and to his car.]

44.   TFO Robertson and SA Farrell debriefed the CS regarding the office visit with Dr.

QANDIL. The CS stated he/she was initially told he/she could not be seen because

the office was not taking new patients without insurance. The CS stated he/she told the office staff he/she had money to pay for the office visit. The CS stated he/she was called back to a small office by Dr. QANDIL (not an examination room). The CS stated Dr. QANDIL offered to give him/her a prescription for Vicodin, Lortab, or Norco without an examination. The CS stated Dr. QANDIL refused to write him/her the prescription for Roxicodone, unless he/she had a patient file and records from a doctor he/she has seen in the past. The CS stated Dr. QANDIL became upset with him/her and told him/her to leave the office. The CS left the office without an examination by Dr. QANDIL or a written prescription.

**November 14, 2012**

45. Agents/Officers from the Detroit Division Office Group 15 Tactical Diversion Squad (TDS) conducted a surveillance of CS-2 (hereinafter referred to as CS) during a walk in office visit with Dr. Basil QANDIL located at 9222 Joseph Campau, Hamtramck, MI. An audio recording device was used (Exhibits N-6) during the CS doctor visit with Dr. QANDIL. The CS obtained written prescriptions from Dr. QANDIL for Vicodin E.S., Daypro, Lidoderm ointment, Pro-air, and an unknown muscle relaxant, during the office visit: Prior to the CS going to QANDIL FAMILY MEDICAL, TFO Joe Robertson, TFO Sarah Buciak, SA Thomas Farrell, and SA James Koss met with the CS at a neutral location and provided the CS with a transmitter device and $300 in Official Advanced Funds (OAF) to cover the expense of the office visit. The CS was also given a Blue Cross/Blue Shield medical insurance card under the fictitious CA name (Contract # XXXXXXXXX), along with a photocopy of a Michigan driver's license reflecting the fictitious name. The CS was instructed to use the listed insurance card during the office visit with Dr. QANDIL. The CS was instructed to use the $300 in OAF in the event of expenses

being charged by the office that were not covered by the insurance card.TFO Buciak, as witnessed by TFO Robertson, performed a physical search of the CS's person with negative results prior to the doctor visit. TFO Robertson, as witnessed by TFO Buciak, performed a physical search of the CS's vehicle with negative results prior to the doctor visit.

a. At approximately 09:00, HHS S/A Gould observed a line of people gather at the front door of QANDIL Family Medical. HHS S/A Gould saw the line of approximately 13 people enter the lobby of QANDIL Family Medical, once the door was unlocked by someone inside.

b. At approximately 09:09 am, The CS arrived at QANDIL Family Medical and TFO Robertson saw the CS park his/her vehicle in the parking lot across from QANDIL Family Medical. HHS S/A Gould saw the CS walk across the street and into the entry door to QANDIL Family Medical.

c. From approximately 9:09 am to approximately 10:45 am, TFO Robertson monitored the activities of the CS inside of QANDIL Family Medical via the audio recording device.

d. At approximately 10:08 am, TFO Robertson could hear the CS speaking to an unknown female (UF 1) inside of the office who appeared to be a worker at QANDIL Family Medical. UF 1 asked the CS a series of questions, asking for his/her name, age, height, smoking history, and if he/she had asthma. After answering the questions, the CS was given a lung capacity test by UF 1.

e. At approximately 10:16 am, TFO Robertson could hear the CS speaking to a male (not the same voice of the doctor as heard on a prior CS office visit on

November 7, 2012). The conversation with the unknown male (UM 1) was

heard as follows:

UM 1:    [Made small talk with the CS and asked if he/she had a history of
         heart problems, asthma, and if he/she smoked.]

CS:      [Reference the asthma question] My mom and dad.

UM 1:    Why are you here? What's your problem?

CS:      Back pain and my leg hurts.

UM 1:    Which leg?

CS:      The right.

UM 1:    Right leg pain...what causes the pain? Car accident?

CS:      A while ago.

UM 1:    How long you have pain? This problem in back?

CS:      It's been off and on about two years.

UM 1:    Scale of one to ten.

CS:      Six

UM 1:    What position does it get worse? Walking? Standing?

CS:      When I sit for a long time.

UM 1:    What position makes it better?

CS:      When I go to sleep.

UM 1:    Laying down.

UM 1:    Are you diabetic? You have asthma? High blood pressure?

CS:      [After blood pressure question] No.

UM 1:    You have transportation?

CS:       No.

UM 1:    No nausea, shortness of breath?

CS:       No

UM 1:    OK, doctor will see you...examine...give you medicine for your problems.

CS:       OK.

UM 1:    See you.

46. TFO Robertson continued monitoring the activities of the CS inside of QANDIL Family Medical. After a period of time, TFO Robertson heard the CS speak to a male whose voice matched that of the doctor heard on the prior CS walk-in office visit on November 7, 2012. The conversation by the CS with Dr. QANDIL is as follows:

QANDIL: What's your name?

CS:       [CS gave the CS fictitious name]

QANDIL: Did they draw your blood?

CS:       Yes

QANDIL: [Could be heard having a conversation to someone not related to the CS]

QANDIL: Rita Gappy?

CS:       Yes

QANDIL: So you have asthma I see...and the back. What type of medication...you're allergic to penicillin only?

CS:       Yes

QANDIL: What kind of medication you took for pain?

CS:       Umm...I took Oxycodone, Vicodin...I took Xanax for my neck.

QANDIL: Which one?

CS:       Oxycodone, Vicodin, and I took Xanax.

QANDIL: Oxycodone requires you to bring your MRI and document it you know. I cannot write it without that but I can give you the Vicodin.

CS:       OK.

QANDIL: OK, so I'm going to give you Vicodin and remember, if you get me your record, I always can write you the Roxi.

CS:       OK.

QANDIL: So you just need to bring it. I give you your inhaler, a muscle relaxant, medicine for pain...you know arthritis...and I give you an ointment for pain too. I will see you back in three weeks. The refill is due also in three weeks. OK, thank you for coming. I will see you back, OK.

CS:       OK.

QANDIL: Bye.

47. Based on the reviewed audio (Exhibit N-6) , Dr. QANDIL spent one minute and fifty-five seconds with the CS before writing the listed prescriptions for Vicodin ES, Daypro, Lidoderm ointment, Pro-air, and an unknown muscle relaxant.

48. TFO Robertson and SA Farrell debriefed the CS regarding his/her office visit at QANDIL Family Medical. The CS indicated that he/she provided a female office worker (UF-1) with personal information and the office worker photocopied the fictitious ID and insurance card. The CS said UF-1 also asked general questions regarding medical history. The CS said he/she was then put into a separate room

with all of the other "new patients." Once inside the separate room, the CS said that he/she was given a urine test, a blood test, blood pressure test, lung capacity test, and an EKG by UF-1. The CS said the EKG was administered in the room with other patients and the instrument leads were just placed under his/her shirt. According to the CS, the EKG instrument leads were not placed in the correct position and the test was not administered properly. The CS said the other new patients were also given tests in the room by UF-1 and she never changed gloves or changed the cover on the mouthpiece on the lung capacity test between patients. The CS said he/she was seen by an Arabic male wearing a white lab coat and stethoscope around his neck (UM-1). The CS said he/she asked another patient if "that was the doctor" and pointed to UM-1. Other patients in the room said, "No, he is nobody." The CS said UM-1 asked questions regarding medical history and the reason for the visit to the doctor.

49. The CS said QANDIL walked him/her to a room labeled "x-ray" and spoke to him/her there. The CS said there was not a patient exam table inside of the x-ray room. The CS said Dr. QANDIL asked questions but never performed any physical examination. The CS said Dr. QANDIL never touched him/her and never asked him/her to perform any tests inside of the room. The CS said Dr. QANDIL told him/her that he could not prescribe Oxycodone without an MRI and prior records but could prescribe Vicodin. The CS said that Dr. QANDIL told him/her what prescriptions he would be giving and wrote them out on a prescription pad, within the view of the CS. The CS said Dr. QANDIL handed the prescriptions to him/her and he left the office without expending any of the $300 in OAF.

**December 5, 2012**

50. At approximately 8:30 am, Agents and officers from the Detroit Field Division Group 15 (TDS) established surveillance at the QANDIL Family Medical located at 9222 Joseph Campau in Hamtramck, MI. The purpose of this surveillance was to monitor an undercover law enforcement officer (UC), during a walk in office visit with Dr. Basil QANDIL. The UC was acting in an undercover capacity using a fictitious UC name. The UC brought an undercover Medicaid card (#XXXXXXXX) with him/her to use for payment for the office visit. TFO Robertson also provided the UC with $300 cash in DEA OAF to cover expenses at the office not covered/accepted using the Medicaid card. An audio recording device was used (Exhibits N-8) during the UC's doctor visit with Dr. QANDIL:

    a. At approximately 8:30 am, TFO Carmack saw approximately five to six males lined up at the door in front of QANDIL Family Medical. At approximately 8:36 am, TFO Wixson saw approximately eight people lined up at the door to QANDIL Family Medical.

    b. At approximately 8:46 am, TFO Carmack saw approximately twelve males and females (combined) lined up outside of the entry door. At approximately 8:50 am, TFO Carmack saw approximately fifteen people standing in front of QANDIL Family Medical.

    c. At approximately 8:57 am, TFO Carmack and TFO Wixson saw the entry door to QANDIL Family Medical open and approximately fifteen people enter the building. At approximately 9:09 am, TFO Carmack saw several more people walk into the entry door to QANDIL Family Medical.

    d. At approximately 9:12 am, the UC arrived in the area of 9222 Joseph

Campau, parked in the plaza across the street, and walked over to the front of QANDIL Family Medical. TFO Carmack saw the UC enter a line of approximately six people waiting in front of QANDIL Family Medical.

e.  At approximately 9:30 am, the UC, along with everyone else waiting outside, were told by a female worker that only fifteen people at a time could be inside of the lobby. The waiting crowd (including the UC) was told, "If ya'll stand here they will not let anyone else in. Stay in your cars across the street and come back in ten minutes." TFO Carmack and TFO Wixson saw the UC walk across the street and get into his car parked in the plaza parking lot.

f.  At approximately 10:14 am, the UC walked from his car back to the front of QANDIL FAMILY MEDICAL. At approximately 10:15 am, TFO Robertson could hear via the transmitter device that the UC was in the waiting room of QANDIL FAMILY MEDICAL.

g.  At approximately 10:38 am, TFO Robertson heard a female voice call the name of the UC. The UC had a conversation with an unknown female (hereinafter referred to as UF) and the details are as follows:

UF:     You're new?

UC:     Yep.

UF:     We are not accepting new patients.

UC:     He's not accepting new patients?

UF:     No.

UC:     Why isn't he accepting new patients? I've been sitting here for an hour.

UF:     I don't know.

UC      So there's no way he is going to see me?

UF:     No

UC:     Even if I pay cash?

UF:     Yeah

UC:     So, I have been sitting here all this time and he is not going to see me.

UF:     I didn't know you were new. I just picked up the piece of paper and it said new...so

UC:     Can he come out and tell me he is not going to see me?

UF:     No, he is not taking new patients. I wouldn't be lying.

UC:     That is some crap right there. I have been sitting here all this time and now you tell me he is not going to see me.

UF:     Sorry.

UF:     [Appears to be a general announcement to room] [Loudly] No new patients!

UC:     When is he gonna accept new patients? [pause, no answer] When is he going to start seeing new patients? [pause, no answer] When is the doctor going to start seeing new patients?

UF:     I don't know.

UC:     So I come in here and sit for an hour...

UF:     [Inaudible]

UC:     OK, but you could have told me an hour ago that he wasn't seeing new patients.

UF:     [Inaudible]

UC:      OK, I'm asking a simple question. When is he going to see new patients?

UF:      [Yells loudly] Maybe we should put a sign out front!

The UF then called a different patient name.

51. TFO Robertson debriefed the UC regarding the office visit inside of QANDIL FAMILY MEDICAL. According to the UC, the interior waiting room was full of people waiting to be seen. The UC said he/she signed in at the desk and waited for his/her name to be called. Once called, the UC said he/she spoke to a female, who appeared to be an employee of the office. The UC said the female employee told him the doctor was not seeing new patients and would not give any reason as to why. The UC said he/she could not get an answer from the female employee and left the office without seeing the doctor or any other medical staff.

**January 14, 2013**

52. On January 14, 2013, Agents and Officers from the Detroit Field Division Group 15 (TDS) established surveillance at QANDIL FAMILY MEDICAL located at 9222 Joseph Campau in Hamtramck, MI. The purpose of this surveillance was to monitor an undercover law enforcement officer (UC), during a walk-in office visit with Dr. Basil QANDIL. The UC was acting in an undercover capacity using a fictitious UC name. Non Drug Exhibit's N-9, N-10, and N-11 were acquired, during the walk in visit with Dr. QANDIL.

53. On January 14, 2013 at approximately 8:20 am, Agents and Officers from the Detroit Field Division Group 15 (TDS) established surveillance at the QANDIL

FAMILY MEDICAL located at 9222 Joseph Campau in Hamtramck, MI. The
purpose of this surveillance was to monitor and undercover law enforcement officer
(UC), during a walk-in office visit with Dr. Basil QANDIL. The UC was acting in
an undercover capacity using a fictitious UC name. The UC brought an undercover
Medicaid card (#XXXXXXXX) with him to use for payment for the office visit.
An audio recording device was used (Exhibit N-9) during the UC's doctor visit with
Dr. QANDIL. An audio/video device was also used by the UC, during the office
visit (Exhibit N-10).

54. At approximately 8:23 am, TFO Robertson saw the UC arrive in the area of 9222
Joseph Campau and park his car in the shopping plaza parking lot across the street
from QANDIL FAMILY MEDICAL.

55. At approximately 8:42 am, TFO Wixson saw six to seven people waiting in line
outside the front door to QANDIL FAMILY MEDICAL.

56. At approximately 8:46 am, TFO Robertson saw the UC get out of his/her parked car
and walk across Joseph Campau and get in the line of people waiting to enter
QANDIL FAMILY MEDICAL.

57. At approximately 9:03 am, TFO Wixson saw the front door to QANDIL FAMILY
MEDICAL open and the line of people (approximately 20 people), including the
UC, enter the lobby to the office.

58. At approximately 9:17 am, an unknown female worker began calling patient names to be seen. At approximately 9:55 am, TFO Robertson could hear, via the audio transmitter, the UC's fictitious name called out.

---

59. At approximately 11:43 am, TFO Robertson could hear, via the audio transmitter, the UC speaking with an unknown male (UM1). The UM1 asked the UC if he/she drinks alcohol or smokes and other medical background questions. UM1 asked the UC why he/she was there and the UC responded, "back pain." The UC elaborated and said that he/she works at the airport lifting bags and that causes him some back discomfort. UM1 asked the UC if he/she had been in a car accident and the UC responded, "No." UM1 asked the UC what level of pain he/she was in now on a scale of 1 to 10. The UC responded, "Four." UM1 asked the UC what body position causes the pain to be worse and the UC indicated that it was worse when he/she bent over and better when he/she stood straight up. UM1 asked the UC "What's that?" The UC responded, "An MRI." The UM1 asked if the MRI was for the UC's back and the UC indicated the MRI was for his/her head because he/she has migraines. UM1 told the UC the doctor would be in to see him/her soon.

60. At approximately 12:01 pm, TFO Robertson could hear the UC speaking with Dr. QANDIL. TFO Robertson recognized the voice of Dr. QANDIL through prior audio surveillances. The conversation by Dr. QANDIL with the UC was as follows:

    QANDIL:  What is your name?

    UC:      [UC gave his name]

QANDIL: What is this?

UC:      MRI

QANDIL: Did you make a copy?

UC:      No

QANDIL: What pain medication you take?

UC:      Nothing right now. I was hoping to get some Vicodin for the back.

QANDIL: I can do that. I will give you Vicodin and other med's.

61. At approximately 12:07 pm, TFO Robertson and TFO Wixson followed the UC to the neutral meet location. TFO Robertson retrieved the transmitter device and audio/video device from the UC. TFO Robertson also retrieved two prescription forms written by Dr. QANDIL to the UC, during the office visit. The written prescriptions listed the following medications. Vicodin ES, Flexeril, Lidoderm cream, and an unreadable fourth medication. TFO Robertson debriefed the UC regarding the office visit with Dr. QANDIL.

62. According to the UC, the interior waiting room was full of people waiting to be seen. The UC said he/she waited in the waiting room for his/her name to be called and was eventually called back to a separate waiting room for new patients only. The UC said he/she saw approximately six female employees inside of QANDIL FAMILY MEDICAL and three of the female employees were working in the new patient waiting room administering breath capacity tests, urinalysis, and blood draws. The UC said he/she provided a urine sample and was given a breath capacity test. The UC refused to give a blood sample. The UC said he/she spoke to an unknown Arabic male (UM1) and was asked several medical screening questions. The UC said that

he/she then spoke to Dr. QANDIL who asked him/her what medications he/she was

currently taking. When the UC told Dr. QANDIL he/she was not taking anything but

would like to get Vicodin, Dr. QANDIL responded, "I can do that." The UC said Dr.

QANDIL wrote four prescriptions to him/her for Vicodin ES, Flexeril, Lidoderm,

and an unknown fourth medication without a medical examination. The UC said that

Dr. QANDIL photocopied his file and MRI but did not review the file prior to

issuing the prescriptions. The UC said he/she paid for the doctor visit with the listed

undercover Medicaid card.

63. Based on your affiants training and experience and the results of the confidential

source / undercover visits to Dr. QANDIL, Dr. QANDIL was not properly

evaluating patients and not acting under the scope of a legitimate medical practice.

Dr. QANDIL issued CS-2 schedule III through V controlled narcotics after a brief

one minute fifty five second conversation and no medical examination. Dr. QANDIL

also issued the UC schedule III through V controlled narcotics after a brief one

minute and twenty seven second conversation and no medical examination. During

confidential source / undercover operations, Dr. QANDIL operated out of the scope

of medical policy by offering to prescribe schedule II controlled narcotics if he could

be provided an MRI or patient file from a different doctor.

## STATE OF MICHIGAN INVESTIGATION

64. On November 5, 2012, TFO Robertson reviewed report #43-124765 that was

completed by Susan Mangan of the State of Michigan Bureau of Health

Professionals, Health Investigation Division in reference to Dr. Basil QANDIL.

65. Susan Mangan obtained a MAPS analysis regarding Dr. QANDIL for the month of April 2012. The MAPS data revealed Dr. QANDIL was the second highest prescriber of controlled substances in the State of Michigan (4,191 prescriptions total with an average of 140 prescriptions a day). **Note**: The highest prescriber of controlled substances in May 2012 were the University of Michigan hospitals and the third largest prescriber of controlled substances was the Henry Ford Hospital Health System.

66. According to the report completed by Susan Mangan, Dr. QANDIL was notified by the State of Michigan in May 2012, via MAPS surveys, that 26 of his patients were obtaining controlled substances from multiple prescribers. According to the report, Dr. QANDIL completed the checklist on the surveys but had not provided comments on any of the surveys to support his prescribing pattern for patients obtaining controlled substances from multiple prescribers. According to Dr. QANDIL's MAPS survey response, none of the 26 patients were discharged from his practice.

67. In an interview with Susan Mangan on June 15, 2012, Dr. QANDIL said that he normally sees 60-70 patients a day and no other licensed physicians were working at the clinic. Dr. QANDIL told Susan Mangan that he has two unlicensed foreign medical doctors working at his office (HANNA, Nadia and MOZEB, Mohamed), and neither were assessing patients. When Susan Mangan asked Dr. QANDIL about the large amounts of controlled substances being prescribed, he responded that he has an obligation to treat patients in pain but would often refer chronic pain patients to "pain

clinics." Dr. QANDIL also told Susan Mangan that he does not prescribe Oxycodone
unless he has supporting documentation in the medical record of the patient.

68. During an interview with Dr. QANDIL by Susan Mangan on June 22, 2012, Dr.
QANDIL indicated that he was out of the country in Jordan from May 19, 2012
through June 3, 2012 (confirmed by DEA SA Galu with customs EPIC# 1228995). A
MAPS analysis completed by Susan Mangan for the month of May 2012 revealed
that Dr. QANDIL prescribed 399 prescriptions (16,025 dosage units) of Alprazolam 1
mg, 378 prescriptions (14,245 dosage units) of Alprazolam 2 mg, 1,246 prescriptions
(72,754 dosage units) of Hydrocodone, and 106 prescriptions (6,511 dosage units) of
Oxycodone 30 mg. Based on the information that Dr. QANDIL was out of the
country from May 19, 2012 through June 3, 2012, Dr. QANDIL prescribed 2,745
prescriptions for an average of 144 prescriptions a day for the nineteen days he was in
the office.

## IX. **PROBABLE CAUSE: HEALTH CARE FRAUD**

69. The Medicare program is the federal health insurance program for the aged and
disabled established by Congress in 1965, as Title 18 of the Social Security Act and
codified at Title 42, United States Code, Section 1395. The Medicare program is
administered through the Centers for Medicare and Medicaid Services (CMS),
formerly the Health Care Financing Administration (HCFA). The CMS is a division
of the Department of Health and Human Services (DHHS) of the United States
Government. Part A of the Medicare program provides medical insurance for acute

care hospital stays, nursing home care and home health care, among other things. Part A of the Medicare program also pays for physical therapy services that are a result of a Medicare beneficiary's stay at any of the aforementioned medical facilities. Part B of the Medicare program provides supplemental medical insurance for physician services, laboratory services, durable medical equipment (DME), outpatient hospital services and other medical services. The CMS program safeguard contractor for health care services in the state of Michigan is Cahaba Safeguard Administrators, LLC. The CMS program safeguard contractor is responsible for the protection of the Medicare Trust Fund through detecting fraud, waste and abuse. Under federal health care programs, such as Medicare, it is illegal to code or bill for services not actually rendered, provide medically unnecessary services, upcode bills, submit duplicate billings, or otherwise fail to follow billing and coding guidelines. Medicare providers have access to procedure code manuals, billing manuals and Medicare service bulletins which describe proper billing procedures and regulations.

70. Your Affiant, along with HHS-OIG, is also investigating health care fraud in violation of Title 18, United States Code, Sections 1347 (Health Care Fraud) and 1349 (Conspiracy to Commit Health Care Fraud). Based upon statements obtained by the DEA and HHS-OIG, and a review of Medicare billing records, it appears that Dr. Qandil is writing medically unnecessary prescriptions for controlled substances. Additionally, for the patients that Dr. Qandil is writing those medically unnecessary prescriptions for controlled substances, it appears as though Dr. Qandil is billing Medicare and/or private insurers for services never provided and/or medically unnecessary.

71. Information obtained by the investigating agents from Cahaba Safeguard Administrators, LLC indicates that Dr. Qandil has an assigned National Provider Index (NPI) number of 1720288749.

72. Analysis of Medicare Part B data reveals that from August 6, 2009 through October 22, 2012, Dr. Qandil, utilizing the NPI number listed above, billed Medicare Part B approximately $2,790,472.52 for a total of 37,213 claims, all of which is attributed to services rendered by Dr. Qandil. For these claims, Medicare Part B paid Dr. Qandil approximately $1,183,979.81. The top procedure codes paid by Medicare Part B include office visit codes, therapeutic injection codes, blood work codes, electrocardiogram codes and spirometry codes. See the spreadsheets embedded below.

| Medicare Part B Data - QANDIL | | | |
|---|---|---|---|
| Year | # Claims | Billed Amt. | Paid Amt. |
| 2009 | 205 | $22,583.50 | $6,069.01 |
| 2010 | 7,796 | $451,196.00 | $173,596.26 |
| 2011 | 17,221 | $1,218,083.50 | $482,195.59 |
| 2012* | 11,991 | $1,098,609.52 | $522,118.95 |
| Totals: | 37,213 | $2,790,472.52 | $1,183,979.81 |
| *2012 Medicare Part B Data is through October 22, 2012 | | | |

| Medicare - Top 10 Procedure Codes - 2009-2012 - QANDIL | | |
|---|---|---|
| Procedure Code | Procedure Description | # of Claims |
| 99214 | OFFICE OR OTHER OUTPATIENT VISIT FOR THE EVALUATION AND MANAGEMENT OF AN ESTABLISHED PATIENT | 11,807 |
| 94760 | NONINVASIVE EAR OR PULSE OXIMETRY FOR OXYGEN SATURATION; SINGLE DETERMINATION | 7,380 |
| 96372 | THERAPEUTIC, PROPHYLACTIC, OR DIAGNOSTIC INJECTION (SPECIFY SUBSTANCE OR DRUG) | 2,887 |
| J3420 | INJECTION, VITAMIN B-12 CYANOCOBALAMIN, UP TO 1000 MCG | 2,527 |
| 36415 | COLLECTION OF VENOUS BLOOD BY VENIPUNCTURE | 2,349 |
| 82962 | GLUCOSE, BLOOD BY GLUCOSE MONITORING DEVICE(S) CLEARED BY THE FDA SPECIFICALLY FOR HOME USE | 2,112 |
| 81002 | URINALYSIS, BY DIP STICK OR TABLET REAGENT FOR BILIRUBIN, GLUCOSE, HEMOGLOBIN, KETONES, LEUKOCYTES | 1,458 |

| | | |
|---|---|---|
| 93000 | ELECTROCARDIOGRAM, ROUTINE ECG WITH AT LEAST 12 LEADS; WITH INTERPRETATION AND REPORT | 1,339 |
| 94010 | SPIROMETRY, INCLUDING GRAPHIC RECORD, TOTAL AND TIMED VITAL CAPACITY | 1,280 |
| 99204 | OFFICE OR OTHER OUTPATIENT VISIT FOR THE EVALUATION AND MANAGEMENT OF A NEW PATIENT | 1,230 |
| | TOP 10 TOTALS | 34,369 |
| | ALL PROCEDURE CODE TOTALS | 37,213 |
| | TOP 10 PERCENTAGE | 92.4% |

73. Of note, during visits to Dr. Qandil by Confidential Sources and Undercover Law Enforcement, Dr. Qandil did not perform physical examinations of the Confidential Sources and Undercover Law Enforcement prior to writing controlled substance prescriptions for these individuals. Furthermore, medical assistants improperly administered electrocardiogram and spirometry tests.

74. During an interview with an investigator from the State of Michigan, Qandil stated that he sees 60-to-70 patients per day. Evaluation of Medicare Part B data indicates that Qandil primarily bills Medicare for procedure code 99214. This code is for the evaluation of established patients and the office visit with Qandil should last approximately 25 minutes. Based upon the training and experience of the United States Health and Human Services-Office of Inspector General Special Agent assigned to this case, and in addition to information obtained during confidential source and undercover visits to Qandil's office that lasted less than two minutes, it is reasonable to believe that Qandil is committing health care fraud by upcoding office visit services that he is billing to Medicare.

75. Based on the information contained in this complaint, probable cause exists that Dr. Basil QANDIL Conspired to Unlawfully Distribute a Controlled Substance, namely Oxycodone, Hydrocodone/Vicodin, Alprazolam/Xanax, and Promethazine with Codeine in violation of Title 21, United States Code, Section 841(a)(1) and 846, and Conspired to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1347 and 1349.

P.O. Joseph W. Robertson

Task Force Officer

Subscribed and sworn to before me this 15th day of January, 2013

R. Steven Whalen
United States Magistrate Judge